IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 19, 2016 Session

**STATE OF TENNESSEE v. BRANDON FROST**

**Appeal from the Circuit Court for Rutherford County**
**No. F-72641          David M. Bragg, Judge**
_____

**No. M2015-02283-CCA-R3-CD – Filed June 14, 2017**
_____

A Rutherford County Circuit Court Jury convicted the Appellant, Brandon Frost, of two counts of aggravated kidnapping, one count of aggravated robbery, and one count of attempted aggravated robbery. The trial court imposed a total effective sentence of ten years in the Tennessee Department of Correction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions, contending that he did not demand money or property from the attempted aggravated robbery victim and that his confinement of the kidnapping victims was incidental to the robbery offenses. The Appellant also contends that the trial court erred by failing to consider mitigating factors when determining the length of his sentences and by failing to grant alternative sentencing. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Gerald L. Melton (on appeal) and Russell N. Perkins (at trial and on appeal), Murfreesboro, Tennessee, for the Appellant, Brandon Frost.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Jennings H. Jones, District Attorney General; Shawn Puckett and Sarah Davis, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

A Rutherford County Grand Jury returned a multi-count indictment charging the Appellant with two counts of especially aggravated kidnapping, one count of aggravated robbery, and one count of attempted aggravated robbery. The charges stemmed from the Appellant's entering a car occupied by Dale and Janet Lature, holding Mr. and Mrs. Lature at knifepoint, and taking money from Mrs. Lature.

At trial, Janet Lature testified that on the night of May 26, 2014, she and her husband, Dale Lature, went to the Subway restaurant on the corner of Stones River Road and Murfreesboro Road in Lavergne. However, the restaurant had closed early because it was Memorial Day. Mr. and Mrs. Lature went inside Fortune Express, a Chinese restaurant in the same strip mall as Subway, and ordered food to take home. They left the restaurant around 7:45 p.m. and returned to their Honda Civic, which was parked in the strip mall parking lot. Mr. Lature unlocked the driver's door, got into the car, and unlocked the other doors. Mrs. Lature got into the front passenger seat. As she sat down, the Appellant opened the back passenger side door, got into the middle of the back seat, and began yelling for Mr. Lature to start driving. Mrs. Lature described the Appellant as a white male, approximately twenty years old, with "straight hair that was very close to his skin." He was wearing a t-shirt that was "earth tones. Like greens and browns and blue and black." Mrs. Lature saw what appeared to be the tops of large letters on the shirt but could not discern what was written on the shirt.

Initially, Mrs. Lature thought the Appellant was joking, but when she turned to look at him, she saw that he was holding a knife "so that it was between [her and her husband]. He could have gone either way." Mrs. Lature was shocked and scared and could only describe the knife as not "a dinner knife" or "a box cutter." The Appellant said, "[A]ll I want is a little bit of money and for you to drive. I'm not going to hurt you as long as you do what I say." Mrs. Lature turned back around to face the front of the car, and Mr. Lature asked where the Appellant wanted to go. The Appellant responded, "I'll tell you where, just drive." Mr. Lature drove out of the parking lot, turned onto Stones River Road, and proceeded toward the intersection with Murfreesboro Road. The Appellant told Mr. Lature to turn right onto Murfreesboro Road. Mrs. Lature could not recall the other directions the Appellant gave.

Mrs. Lature said that while Mr. Lature was driving, the Appellant either pointed the knife or nodded his head toward Mrs. Lature's purse, which she was holding in her lap, and said, "[S]how me what you have got there." Mrs. Lature said that because the Appellant had said he wanted money, she "knew some kind of request was coming." Mrs. Lature searched her purse and gave the Appellant all of the "paper money" she could find, which was fifty-nine or sixty dollars. Mrs. Lature said that she gave the Appellant money only because he had a knife. Mrs. Lature glanced at the Appellant so she would remember how he looked. She noticed that he occasionally ducked down in the back seat as if he were hiding.

Mrs. Lature recalled that when they reached a residential area, the Appellant told Mr. Lature to stop the car. After Mr. Lature complied, the Appellant said that he was going to get out of the car and that they should continue driving. The Appellant said, "[S]orry for the inconvenience, have a blessed day," then exited the car and ran away. Mrs. Lature estimated that the incident lasted five minutes but said that it seemed to last an hour. She stated that while the Appellant was in the car, she did not feel free to leave.

After the Appellant left, Mr. Lature drove for a while then called 911. Mr. and Mrs. Lature met with the police at the nearby Lavergne First United Methodist Church and then went to the police station and gave a statement. While Mr. and Mrs. Lature were at the station, the police showed them a photograph of the Appellant, from which Mrs. Lature identified the Appellant as the perpetrator. Thereafter, the police brought the Appellant into the station. The Appellant was wearing different clothes, but Mrs. Lature was able to identify him as the perpetrator. She also positively identified the Appellant in court and identified a t-shirt that appeared to be the one the Appellant was wearing during the offense.

Mrs. Lature said that in November 2014, the Appellant called her cellular telephone while she was in a car with Mr. Lature. Mr. Lature answered the telephone via the car's Bluetooth device. The Appellant identified himself and said that he wanted to apologize. He reassured Mr. and Mrs. Lature that "he wasn't that kind of a person" and that he had "found God." Mrs. Lature said that the Appellant acknowledged the call "would have no bearing on his case. But he just wanted to let [them] know that he wasn't a bad person." The call frightened Mrs. Lature because she did not know how the Appellant knew her telephone number.

On cross-examination, Mrs. Lature acknowledged that in her statement to the police, she said that the Appellant said "just drive" and "I'm not going to hurt you." She further acknowledged that she said the Appellant "didn't sound angry, just determined." She thought the Appellant's apology as he got out of the car and his comment to have a "blessed day" was unusual. Mrs. Lature said that during the telephone call, the Appellant did not try to get her or her husband to "do anything."

Dale Lature testified that around 7:30 or 8:00 p.m. on Memorial Day 2014, he and his wife went to get food from Subway, which was in the "Food Lion shopping center." Because the restaurant was closed, they went to the Fortune Express restaurant, got some food, and returned to their car. They did not notice anyone else in the parking lot. Mr. Lature unlocked the doors, and they got into the car. Mr. Lature heard someone get into the back seat and close the door. Mr. Lature was able to see that the person was a young, white male, but he could not identify the Appellant as the man inside the car. The Appellant had a knife and instructed Mr. Lature to drive. Mr. Lature complied.

Mr. Lature said that the Appellant asked, "[W]hat do you have there in terms of money?" Mr. Lature thought the Appellant was speaking to him and his wife. The Appellant promised not to hurt them if they complied with his demands to "drive [him] somewhere and give [him] a little money." The Appellant told Mr. Lature to drive down Murfreesboro Road then gave further directions. When they reached Mason Road, the Appellant told Mr. Lature to stop. The Appellant got out of the car and said, "[S]orry for the inconvenience, have a blessed day."

Mr. Lature was unsure whether the Appellant displayed the knife throughout the incident but surmised that he probably did not. After the Appellant got out of the car, Mr. Lature drove away and called 911. They met the police at a Methodist church on Waldron Road and then went to the police station and gave a statement.

Mr. Lature said that neither he nor Mrs. Lature told the Appellant their names and that the Appellant did not take anything that would reveal their identities. Nevertheless, sometime after the offense, they received a telephone call from the Appellant. The Appellant said that after he was incarcerated, he realized that he made a bad decision on "that night back in May" and that he hoped they could forgive him. Mr. Lature thanked the Appellant for calling. Mr. Lature said that the Appellant's statements sounded "pre-written" but sincere.

Mr. Lature said that he had never met the Appellant before the night of the robbery. Mr. Lature did not feel free to leave while the Appellant was in the car with the knife. During the incident, Mr. Lature felt "apprehensive" and "afraid."

On cross-examination, Mr. Lature said that the Appellant was pointing at Mrs. Lature's purse when he said "let me see what you have got there." Mr. Lature said that once he saw the knife, he did not turn to look at the Appellant or the knife.

The parties stipulated that Mr. and Mrs. Lature's telephone number was in the discovery materials provided to the defense by the State.

Officer Steven Crotts, a crime scene technician with the Lavergne Police Department, testified that he was dispatched to a church on Waldron Road to meet with Mr. and Mrs. Lature. After they told Officer Crotts about the incident, he took them to Mason Road so they could show him where they had left the Appellant. Subsequently, he took them to the police station, and they wrote statements regarding the incident. Officer Crotts took photographs of their blue Honda Civic, but he was unable to find usable fingerprints on the vehicle.

Detective Matt Fracker testified that he spoke with Mr. and Mrs. Lature at the police station. Afterward, Detective Fracker learned that a potential suspect was at Right Road Ministries ("Right Road"), which was a "recovery rehab type center." Detective Fracker spoke with Ross Marshall, a resident at Right Road, then talked with Lemarcus Moore, who shared a room with the Appellant. After receiving the Appellant's consent, Detective Fracker searched the Appellant's room and found a light blue and green t-shirt on the bed. Detective Fracker later showed the shirt to Mrs. Lature, who identified it as the one the Appellant was wearing during the crimes. Additionally, she identified the Appellant as the perpetrator.

Lamarcus Moore testified that in May 2014, he was living at Right Road, which he described as a "transition" facility to help people "get back up on their feet." Mr. Moore had two roommates, one of whom was the Appellant. Mr. Moore was unsure whether the Appellant had a job at the time of the offense. On the day of the robbery, Mr. Moore did not see the Appellant until 7:00 or 8:00 p.m. The Appellant came into their room "real sweaty" and "out of breath," removed his blue shirt, and put on a white shirt. Mr. Moore identified the shirt found by Detective Fracker as the one the Appellant removed. Mr. Moore asked what was wrong, but the Appellant did not respond. Mr. Moore then left the room. A short time later, the Appellant returned and apologized for stealing Mr. Moore's knife, which was a silver pocket knife with a three and one-half-inch blade.

Ross Marshall testified that in May 2014, he was living at Right Road and that he knew the Appellant. Mr. Marshall could not recall whether the Appellant had a job at that time. Mr. Marshall said that the Appellant was preparing to leave Right Road because "[h]e couldn't stay there no more." On the evening of the robbery, the Appellant approached Mr. Marshall and said that "he had to get something off his chest." The Appellant revealed that he had robbed an older couple near a grocery store and obtained sixty dollars. Mr. Marshall did not believe the Appellant and asked how the robbery was accomplished. The Appellant responded, "I jumped in the car, and I had a knife." When Mr. Marshall remained skeptical, the Appellant showed him "a wad of cash." Mr. Marshall said, "[T]hat's not good." Mr. Marshall testified that the Appellant acted nervous.

Mr. Marshall encouraged the Appellant to tell the director of the ministry, Steve Beecham, about the robbery, but the Appellant refused. Mr. Marshall got Mr. Beecham alone outside and informed him of the Appellant's crime. Around that time, the police arrived at Right Road, and Mr. Marshall told them everything the Appellant had said.

On cross-examination, Mr. Marshall said that he did not give a statement at the police station but that he wrote a statement while at Right Road. In the statement, he wrote that the Appellant said he stole a knife from the kitchen of Right Road and walked to Food Lion.

The Appellant did not testify or put on proof.

Based upon the evidence adduced at trial, the jury found the Appellant guilty of the aggravated kidnapping of Mr. Lature, the aggravated kidnapping of Mrs. Lature, the aggravated robbery of Mrs. Lature, and the attempted aggravated robbery of Mr. Lature. The trial court imposed a total effective sentence of ten years in the Tennessee Department of Correction.

On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions, arguing that he did not demand money or property from Mr. Lature and that his confinement of Mr. and Mrs. Lature was incidental to the robbery offenses. The Appellant also contends that the trial court erred by failing to consider mitigating factors when determining the length of his sentences and by failing to grant alternative sentencing.

## II.  Analysis

### A.  Sufficiency of the Evidence

The Appellant challenges the trial court's denial of his motion for a judgment of acquittal, which was made at the conclusion of the State's proof. However, "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction . . . ." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Therefore, we will address the Appellant's complaint as a challenge to the sufficiency of the evidence.

On appeal, a jury conviction removes the presumption of an appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of an appellant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Initially, we note that a criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3). Aggravated robbery is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

Relevant to this case, Tennessee Code Annotated section 39-13-305(a)(1) defines especially aggravated kidnapping as "false imprisonment, as defined in § 39-13-302 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." False imprisonment is defined as the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty. Tenn. Code Ann. § 39-13-302(a). The jury ultimately convicted the Appellant of aggravated kidnapping, which, as defined in this case, is false imprisonment "[c]ommitted . . . [w]hile the defendant is in possession of a

deadly weapon or threatens the use of a deadly weapon." Tenn. Code Ann. § 39-13-304(a)(5).

In the light most favorable to the State, the proof adduced at trial established that Mr. and Mrs. Lature parked their car and walked into a restaurant in the Food Lion shopping center. When they returned to their car, the Appellant got into the back seat of the car, gave directions, held a knife between them, and told them that he wanted money and would not hurt them if they complied. While Mr. Lature was driving, the Appellant pointed at Mrs. Lature's purse and said, "[S]how me what you have got there." Mrs. Lature removed approximately sixty dollars from her purse and gave it to the Appellant. The Appellant gave Mr. Lature directions to a location on Mason Road then instructed him to stop. The Appellant got out of the car, apologized, told them to have a "blessed day," and ordered them to continue driving. Mr. Lature drove away and called 911. Shortly thereafter, the police found the Appellant at Right Road, and he was positively identified by Mrs. Lature as the perpetrator. The Appellant told his roommate that he had stolen the roommate's knife and robbed an older couple near a grocery store. He also told another Right Road resident that he had taken a knife and robbed a couple. During a search of the Appellant's room, the police found the shirt the Appellant was wearing at the time of the offense. Sometime after his apprehension, the Appellant called Mr. and Mrs. Lature to apologize for his actions.

The Appellant first challenges his convictions of aggravated kidnapping. He concedes that the State established the elements of the charged offense of especially aggravated kidnapping, specifically that he confined or removed Mr. and Mrs. Lature and that he used a knife during the commission of the offense. Nevertheless, the jury convicted the Appellant of aggravated kidnapping. The Appellant contends that in order to convict him of aggravated kidnapping instead of especially aggravated kidnapping, the jury had to find that the detention of the victims was incidental to the robbery offenses. The Appellant asserts that if the detention was incidental to the robberies, then he also should have been acquitted of aggravated kidnapping. The State responds that the detention of the victims was not incidental to the robberies. We agree with the State.

Our case law reveals a long-standing issue regarding the legitimacy of a kidnapping conviction when the act(s) establishing the offense occurred during an accompanying felony. Notably, in State v. Anthony, 817 S.W.2d 299, 301 (Tenn. 1991), a jury convicted the defendant of the armed burglary of a Shoney's restaurant, the armed robbery of the restaurant's manager, and the aggravated kidnappings of the manager and five other employees. In a split decision, this court reversed all of the aggravated kidnapping convictions, holding that "[u]nless independent and separate fact patterns for both the armed robbery and the aggravated kidnapping can be proven, [a defendant] can be convicted of only the armed robbery." Anthony, 817 S.W.2d at 30. Our supreme court, citing due process concerns, held that before a separate kidnapping conviction may

be sustained, there must be a determination of "whether the confinement, movement, or detention [was] essentially incidental to the accompanying felony and [was] not, therefore, sufficient to support a separate conviction for kidnapping, or whether it [was] significant enough, in and of itself, to warrant independent prosecution and [was], therefore, sufficient to support such conviction." Id. at 306. After its own analysis, our supreme court affirmed this court's decision. Id. at 307-08.

Later, in State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997), our supreme court modified the Anthony court's "essentially incidental" analysis and established a two-prong test for determining whether a separate conviction for kidnapping violates due process. The first step concerned a determination of whether the movement or confinement was beyond that necessary to commit the accompanying felony. Id. If so, the second step was to determine whether the additional movement or confinement (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. Id.

Thereafter, in State v. White, 362 S.W.3d 559, 578 (Tenn. 2012), our supreme court expressly overruled Anthony and its progeny, holding that "[t]he separate due process test articulated first in Anthony, and subsequently refined in Dixon . . . , is . . . no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony." Instead, the court held that "whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law," thereby concluding that a defendant's constitutional concerns are protected by appellate review of the sufficiency of the convicting evidence. Id. at 577-78. Therefore, our supreme court cautioned that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." Id. To effectuate this end, our supreme court devised the following instruction to be given by trial courts:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> • the nature and duration of the victim's removal or confinement by the defendant;

- whether the removal or confinement occurred during the commission of the separate offense;

- whether the interference with the victim's liberty was inherent in the nature of the separate offense;

- whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

- whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

- whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

Id. at 580-81 (footnote omitted).

In the instant case, the jury was properly instructed according to the dictates of White. The jury heard proof that revealed the Appellant could have effectuated the robberies in the parking lot, but he chose to hold the victims at knifepoint and make them drive him to another location. The victims testified that they did not feel free to leave the car. The Appellant detained the victims before and after he took money from Mrs. Lature. The jury found that the detention of the victims was not incidental to the robberies. We agree. See State v. Lonnie M. Maclin, No. W2004-00468-CCA-R3-CD, 2005 WL 2648333, at *6 (Tenn. Crim. App. at Jackson, Oct. 17, 2005).

Moreover, we may not speculate as to why the jury convicted the Appellant of the lesser-included offense of aggravated kidnapping instead of the charged offense of especially aggravated kidnapping. See State v. Wiggins, 498 S.W.2d 92, 93-94 (Tenn. 1973); State v. Arterio Holman, No. W2008-00318-CCA-R3-CD, 2009 WL 1819239, at *6 (Tenn. Crim. App. at Jackson, June 26, 2009).

The Appellant also challenges his conviction of attempted aggravated robbery, arguing that the State failed to adduce proof that he attempted to take property from Mr. Lature. However, contrary to the Appellant's contention, Mr. Lature testified that the Appellant demanded money and that the demands were directed at both Mrs. Lature and him. We conclude that the proof was sufficient to sustain the Appellant's conviction of the attempted aggravated robbery of Mr. Lature.

## B. Sentencing

At the sentencing hearing, Detective Fracker testified that as part of his investigation, he obtained a warrant to search the Appellant's cellular telephone. Among the photographs on the telephone was a photograph of a handgun and ammunition. The photograph was admitted as an exhibit to Detective Fracker's testimony. At the time, the Appellant was nineteen or twenty years old. Detective Fracker said that in Tennessee, a person must be twenty-one years old to legally own a handgun.

Detective Fracker said he had been employed with the Lavergne Police Department for approximately four years and that during that time, robberies and kidnapping had "been a problem in Lavergne." He obtained from the Lavergne Police Department a copy of statistics regarding the crimes, which was submitted as an exhibit without objection.

On cross-examination, Detective Fracker acknowledged that he did not know the original source of the photograph found on the Appellant's cellular telephone. Detective Fracker further acknowledged that the police did not find a handgun or ammunition in the Appellant's possession.

Connie Hardeman, the Appellant's paternal aunt, testified that the Appellant's childhood was "rough." She explained that the Appellant had three siblings, that his parents had "addiction problems," and that he and two of his siblings also had "addiction problems." Ms. Hardeman stated that while growing up, the Appellant lived mostly with his mother. During that time, he had no supervision and "did a little bit of every kind of drug you can think of." Later, the Appellant lived with his father and his grandmother; however, he had to leave in 2013 because he used drugs and got in trouble. He then began living with Ms. Hardeman under the conditions that he did not lie, steal, or use drugs. The Appellant complied with the conditions for several months, then he "mess[ed] up." He left at Ms. Hardeman's request but "came back later and was struggling again." At that point, the Appellant went to Right Road to live. Ms. Hardeman opined that the Appellant "felt hopeless" and that he may have committed the offenses because he "was looking for somewhere to go" and thought he might be able to get off drugs if he were sent to jail.

Ms. Hardeman thought that drugs were the cause of all the Appellant's troubles, including the instant offenses. She noted that "[h]is drug of choice was marijuana" but that he would take "whatever he could get." Ms. Hardeman said that the Appellant had "one of the sweetest hearts" but that he had a "temper problem." Nevertheless, she did not think the Appellant would hurt anyone.

Ms. Hardeman recalled that the Appellant had been diagnosed with bipolar disorder and attention deficit hyperactivity disorder (ADHD) and that he had been prescribed medication. However, because of the strict rules regarding drugs at Right Road, the Appellant was unable to take his medication.

She stated that when the Appellant was "on drugs, all he [could] think about [was] the next one." However, when he was not on drugs, he was different and was well-liked. Ms. Hardeman said that after the Appellant's arrest, he was released on bond and went to "Life Changers," which helped to treat his addiction. She said that the Appellant "blossom[ed]" in treatment. She asked that attendance at Life Changers be part of the Appellant's sentences.

The State submitted a copy of the Appellant's presentence report as an exhibit. The presentence report reflected that the Appellant had two convictions of possession of burglary tools as well as juvenile adjudications of assault, automobile burglary, theft over $500, and possession of drug paraphernalia. The State also submitted, without objection, transcripts of jail telephone calls that had not been introduced at trial.

The twenty-year-old Appellant testified that he did not dispute that he "got in the car with these folks, [he] took some money from them, [and] got out." The Appellant said that he had ADHD and sometimes had difficulty focusing. Accordingly, he wrote a statement and read it for the court. In the statement, the Appellant said that he accepted responsibility for his actions. He stated that he realized he had "potential" when sober and that typically, he was non-violent but that he had been involved in a "very dangerous lifestyle" and had made "poor decisions." The Appellant said that he was not asking for pity but expressed a desire to overcome his addiction and thought that Life Changers would help in that endeavor. The Appellant explained that Life Changers was an "inpatient" program with more supervision than Right Road, which "was more like a halfway house."

The Appellant maintained that all of his juvenile adjudications were related to his drug use. He said that he had completed the ninth grade but that he did not graduate from high school or have a general equivalency diploma (GED). The Appellant said that he had taken medication for his ADHD but was now "able to cope without having to take medication."

The Appellant said that on the night of the offenses, he was asked to leave Right Road. The Appellant left Right Road, took some Xanax pills, and "kind of blacked out after that." He recalled walking down Murfreesboro Road but did not recall the remainder of that night's events. He did not, however, deny the victims' version of events.

The Appellant said that while in jail, he began to feel guilty about what he had done. He learned the victims' telephone number from the discovery materials and called them to apologize. The Appellant told the court that he was sorry for what he had done.

The Appellant said that his parents divorced when he was approximately three years old and that he and his siblings began living with his mother. She sold her food stamps and spent her child support payments in order to get methamphetamines. When the Appellant was approximately eight years old, he began living with his father and paternal grandmother. After approximately one year, the Appellant "got into drugs again" and began "doing everything [he] could" to get drugs.

The Appellant said that he "went to juvenile for the first time" when he was fifteen years old and that he was sent to the Juvenile Department of Correction when he was sixteen years old. After he was released on parole, he was charged for new offenses. He was returned to juvenile corrections for five months then went to a group home for approximately six months.

The Appellant said that he had worked for a couple of factories, a restaurant, and a temporary employment service.

On cross-examination, the Appellant acknowledged that he was arrested in Illinois in 2012. He thought his attorney had "taken care of" the charge and was surprised to learn that a warrant for his arrest was outstanding.

The Appellant stated that he had been to "rehab" on five occasions and had completed the rehabilitation programs on three occasions. Nevertheless, he returned to drugs. He acknowledged that he "made some bad decisions due to . . . ignorance and immaturity and foolishness."

Jeff Tenaglia, a community corrections officer, testified that the Appellant ordinarily would be ineligible for community corrections because of the nature of the offense but that he could possibly qualify under the special needs section of the community corrections statute.

The trial court, after considering the principles of sentencing, found that the Appellant was a Range I, standard offender. The trial court applied enhancement factor (1), that the Appellant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(1). The trial court also applied enhancement factor (16), that the Appellant was adjudicated to have committed a delinquent act as a juvenile which would have constituted a felony if it had been committed while he was an adult. Id. at (16). The trial court applied mitigating factor (6), that the Appellant, because of his youth, lacked

- 13 -

substantial judgment in committing the offense. Tenn. Code Ann. § 40-35-113(6). The trial court also found that the Appellant was not an appropriate candidate for alternative sentencing because he had poor rehabilitative potential. The trial court sentenced the Appellant to concurrent sentences of ten years at one hundred percent for each aggravated kidnapping conviction, ten years for the aggravated robbery conviction with release eligibility after serving eighty-five percent, and six years for the attempted aggravated robbery conviction with release eligibility after serving thirty percent.

On appeal, the Appellant argues that the trial court erred in determining the length of his sentences and in denying alternative sentencing. This court reviews the length, range, or manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentenc'g Comm'n Cmts.

A. Length of Sentences

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The Appellant contends that the trial court failed to consider and apply mitigating factors. He argues that the "provocation for his actions, together with the fact that he was trying to provide for himself one of the most basic needs for anyone—a place to live— clearly were proven." The Appellant also argues that the trial court should have applied mitigating factors (2), that he acted under strong provocation; (3), that substantial grounds exist tending to excuse or justify the Appellant's criminal conduct, though failing to establish a defense; (6), that the Appellant, because of his youth, lacked substantial judgment in committing the offense; (7), that the Appellant was motivated by a desire to provide necessities for himself; (11), that the Appellant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct; and (13) the "catch-all" factor that includes, but is not limited to, "lack of a substantial prior record." Tenn. Code Ann. § 40-35-113(2), (3), (6), (7), (11), and (13).

The trial court considered the mitigating factors submitted by the Appellant and found the only applicable mitigating factor was that the Appellant, because of his youth, lacked substantial judgment in committing the offense. Tenn. Code Ann. § 40-35-113(6). The court found that the Appellant's eviction from Right Road for violating the rules did not act as strong provocation that justified his actions. The trial court rejected the Appellant's claims that substantial grounds existed to excuse or justify his conduct and that he was motivated by a desire to provide for himself. The trial court further rejected the Appellant's claim that he did not have a sustained intent to violate the law, finding that the Appellant previously had violated the law and that he had developed and executed a plan. We conclude that the trial court did not abuse its discretion by rejecting the mitigating factors requested by the Appellant.

The Appellant also contends the trial court should have considered that Tennessee Code Annotated section 39-13-304(b)(2), the aggravated kidnapping statute, requires a

- 15 -

trial court to consider as a mitigating factor that the Appellant voluntarily released the victims alive. No mention was made of the mitigating factor at the sentencing hearing. However, at the hearing on the motion for new trial, defense counsel reminded the trial court that the voluntary release of the victims should have been considered in mitigation. The trial court explained that although it did not specify at the sentencing hearing that it considered the voluntary release of the victims as mitigation, the court nevertheless considered it when determining the length of the Appellant's sentences.

The Appellant complains that although the trial court stated that it took the voluntary release of the victims into consideration during sentencing, it did "not explain how [it] did so, or what effect it had on [its] decision." The Appellant further complains that the trial court did not "change the sentence in any way after this issue was brought to [its] attention."

We note that at the sentencing hearing, the trial court stated:

> [I]t was so insignificant to [the Appellant] that when he got out of the vehicle after holding two people hostage at the point of a knife and requiring them to drive around and taking money, he told them he was sorry for the inconvenience, have a blessed day.
>
> It's difficult for the Court to imagine how such behavior could be so insignificant to justify that type of response to people who you have held hostage at the point of a knife and required to drive you around at your direction, them not having a clue as to what's going to happen other than your offhand remark, if you do what I say, I won't hurt you.

In our view, the foregoing comments show that the trial court found that the voluntary release of the victims was entitled to little weight. This court has repeatedly cautioned that "[m]ere disagreement with how the trial court weighed enhancing and mitigating factors is not an adequate basis for reversing a sentence." State v. Banks, 271 S.W.3d 90, 146 (Tenn. 2008) (citing Carter, 254 S.W.3d at 345-46). Therefore, we conclude that the trial court did not err in determining the length of the Appellant's sentences.

## B. Alternative Sentencing

Finally, the Appellant contends that the trial court erred by imposing a sentence of full confinement. The Appellant argues that the trial court should have imposed either

full probation, community corrections, or an alternative sentence of split confinement, which would include participation in a drug treatment program. The State responds that the trial court correctly denied alternative sentencing.

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The Appellant's sentences meet this requirement. However, because the Appellant was convicted of Class B felonies, he is not considered to be a favorable candidate for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6).

Tennessee Code Annotated section 40-35-103(1) sets forth the following sentencing considerations which are utilized in determining the appropriateness of alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

See also State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

We note that the Community Corrections Act of 1985 was enacted to provide an alternative means of punishment for "selected, nonviolent felony offenders in front-end community based alternatives to incarceration." Tenn. Code Ann. § 40-36-103. Tennessee Code Annotated section 40-36-106(a)(1) provides that an offender who meets all of the following minimum criteria shall be considered eligible for community corrections:

> (A) Persons who, without this option, would be incarcerated in a correctional institution;

- 17 -

(B) Persons who are convicted of property-related, or drug- or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;

(C) Persons who are convicted of nonviolent felony offenses;

(D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(E) Persons who do not demonstrate a present or past pattern of behavior indicating violence;

(F) Persons who do not demonstrate a pattern of committing violent offenses . . . .

This court has observed that

[p]ersons who do not otherwise satisfy the minimum criteria and who would usually be considered unfit for probation due to histories of chronic alcohol abuse, drug abuse, or mental health problems, but whose special needs are treatable and could be served best in the community may be considered eligible for participation in a community corrections program.

State v. Denny James McAbee, No. M2011-01524-CCA-R3-CD, 2012 WL 3673004, at *5 (Tenn. Crim. App. at Nashville, Aug. 24, 2012) (citing Tenn. Code Ann. § 40-36-106(c)). When determining if an offender should be sentenced to community corrections because of special needs, an offender's "rehabilitative potential is central in the selection process." State v. Grigsby, 957 S.W.2d 541, 547 (Tenn. Crim. App. 1997). We note that even if an offender "meets the minimum requirements of the Community Corrections Act of 1985, [it] does not mean that he is entitled to be sentenced under the Act as a matter of law or right." State v. Ball, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998) (citing State v. Taylor, 744 S.W.2d 919 (Tenn. Crim. App. 1987)).

The trial court found that no form of alternative sentencing was appropriate for the Appellant. The trial court acknowledged that the Appellant had a "very difficult childhood." The trial court noted, however, that "the State of Illinois and the State of Tennessee have interacted with [him] and tried to get him help and tried to get him on the right path" but that despite attempts at state-sponsored rehabilitation and numerous drug treatment programs, the Appellant failed to rehabilitate. The trial court observed that the

- 18 -

Appellant did not show interest in rehabilitation until he realized the seriousness of the offenses he had committed and the resulting consequences. The trial court found that the Appellant previously violated the law and that he would likely reoffend if granted alternative sentencing, that "measures less restrictive than confinement had frequently or recently been applied unsuccessfully to the [Appellant]," and that confinement would provide an effective deterrent to others likely to commit similar offenses. We conclude that the trial court did not abuse its discretion by denying alternative sentencing.

### III.  Conclusion

Finding no error, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE